# Traylor Estate

48

*Orrin E. Boyle*, for accountants.

*Charles G. Helwig*, for exceptant.

GEARHART, P. J., February 14, 1952.—This dispute centers about commissions charged by the trustees. Samuel W. Traylor, Jr., W. J. Roberts, Sr., and Dr. Warren Traylor, have filed their first and final account as trustees under a voluntary deed of trust known as the "Ashmont Apartments Trust", created by Samuel W. Traylor, Sr.

Exceptions were filed by Lottie G. Traylor to the commissions charged in the amount of $23,083.45. Considerable testimony in support of the exceptions was submitted.

Samuel W. Traylor, Sr., died November 12, 1947, and his will, dated April 9, 1946, was duly probated in the office of the Register of Wills for Lehigh County.

The voluntary deed of trust was executed by Samuel W. Traylor, Sr., late of Allentown, Pa., on February 10, 1939. By its terms the trust property was placed in the hands of himself, i.e., Samuel W. Traylor, Sr., Samuel W. Traylor, Jr. and W. J. Roberts, Sr., as trustees. The res consisted of real estate known as the Ashmont Apartments, located at 908 South Hobart Boulevard, Los Angeles, Calif., and a parking lot adjacent thereto, together with all furnishings, fixtures, equipment and personal property in the apartment.

The deed of trust provides that upon the death of Samuel W. Traylor, Sr., if his wife, Lottie G. Traylor, survived him as his widow and abided by and performed the provisions of the antenuptial agreement entered into between Samuel W. Traylor, Sr., and Lottie G. Traylor on June 20, 1921, and further agreed to abide by the provisions of the last will and testa-

ment of Samuel W. Traylor, Sr., the Ashmont Apartments, the lot adjoining, and the furnishings of the Ashmont Apartments, together with the accrued income from the trust should be transferred to her absolutely and in fee. Settlor in the same instrument provides what shall be done with the trust property in the event that his wife elects to take against his will. In that event the property described in the trust instrument was to be transferred and conveyed to settlor's sons, Samuel W. Traylor, Jr., and Dr. Warren Traylor.

The trustees are given "full power to manage and operate the properties herein described, make leases of the several apartments, make repairs, replacements and improvements to the property, use income for the payment of the principal of obligations secured upon the property and to pay the balance of the purchase price on the aforesaid Lot No. 214 and shall not be answerable for the exercise of their sound discretion in the administration of this trust". Settlor expressly surrendered his right to alter or amend or annul the trust instrument in anywise.

Settlor's wife, Lottie G. Traylor, survived Samuel W. Traylor, Sr., and on May 13, 1948, elected to take under the terms of his last will and testament, and on the same day entered into an agreement with the trustees agreeing to accept the provisions of the deed of trust dated February 10, 1939.

The exceptions are three in number, each with alphabetical subdivisions. They are lengthy and need not be recited verbatim. In substance, exception no. 1 contends that the accountants are not entitled to any commissions on principal or income, with reasons therefor. Exception no. 2 contends that if the accountants are entitled to any compensation whatever, the amount of $23,083.45 is unreasonable and all out of proportion to the value of the services rendered by the trustees.

Exception no. 3 contends that whether or not the accountants are entitled to any compensation, they should be surcharged with interest at the legal rate on the respective sums of money loaned to Dr. Warren Traylor from the date when such loans were made to the date of repayment thereof.

In determining what compensation the trustees are entitled to, if any, we start with the well-established principle that "in Pennsylvania, fiduciaries have always been held to be entitled to fair and just compensation for services rendered". Williamson Estate, 368 Pa. 343, 348. It has been held in a number of cases that while fiduciaries are frequently paid on a percentage basis, this is merely a matter of convenience: Harrison's Estate, 217 Pa. 207; O'Brien's Estate, 59 Pa. Superior Court 19; Miller's Estate, 132 Pa. Superior Court 437. A true test always is what is a fair and just compensation, and this depends on the extent and character of the labor and responsibility involved: Strickler Estate, 354 Pa. 276, 277. And what is a fair and just compensation for services rendered must necessarily be determined by the facts and circumstances of each case: McCaskey's Estate, 307 Pa. 172, 178; Davidson's Estate, 324 Pa. 90, 96; Williamson Estate, supra, 360.

It is also well established that in the absence of a provision as to compensation, the trustee is entitled to receive a reasonable allowance out of income passing through his hands during the term of the trust, and to reasonable compensation out of corpus for its care and preservation, at the termination of the trust: Culbertson's Appeal, 84 Pa. 303, 305; Heckert's Appeal, 24 Pa. 482, 486; Kennedy Trust, 364 Pa. 310. It is also true that a fiduciary may waive or renounce his right to compensation either by acts or conduct. (Taylor's Estate, 239 Pa. 153; Fitzgerald's Estate, 252 Pa. 575, 577.) The waiver of compensation may be

in whole or in part. (Mulligan's Estate, 157 Pa. 98; Card's Estate, 337 Pa. 82, 86; Scull's Estate, 249 Pa. 57, 61.)

The accountants rely on the rule stated in Kennedy Trust, supra, and insist that the silence of the settlor with respect to compensation cannot militate against their right to be paid. Exceptant distinguishes the Kennedy case from the instant case on the ground that the facts and circumstances surrounding these accountants indicate that they have waived their right to compensation. Thus, compensation would be denied the trustees not because of what the settlor omitted to say, but rather by what the trustees themselves did or did not do.

Since the trustees for 11 years did not make an annual or periodical charge for compensation out of income, and since no amount was reserved on the trustees' books for future payment, they thereby indicated that no charge was to be made. And again, the trustees while punctiliously taking credit for all disbursements made by them, have omitted to take credit for the payment or accrual of any commission on income in their annual Federal Income Tax returns. This was no oversight, for able and experienced accountants kept the books and prepared the tax returns. We agree with exceptant that the reasonable inference to be drawn from this is that the trustees did not intend to charge commissions on income. To hold contrariwise, that is, that they deliberately omitted to take deductions for tax purposes, convicts them of imprudent management, for the trust fund lost the advantage of the tax deductions for 11 years. It is no answer now to say that the deductions for commissions will be taken in the final year and that therefore the loss will not be as large as it first appears. The relevant point is that the trustees by their actions indicated that no commissions were to be charged on

income. Exceptant widow when she entered into the agreement of May 13, 1948, accepting the terms of the trust, in the absence of explanation, had a right to rely on the acts of the trustees themselves.

Other facts and circumstances buttress this view, and in determining what the compensation of a trustee should be, it is the court's duty to consider all of the circumstances of the case: McCaskey's Estate, supra, 178; Perkins' Appeal, 108 Pa. 314; Davidson's Estate, supra, 96.

What then are the additional circumstances that would indicate that no commission was to be paid on income? In the first place, the settlor in creating this trust, did so to provide financial security for his wife. His oft-repeated words to his wife were that he intended to provide "a steady income for the rest of" her life. The subsidiary reason for setting up the trust was settlor's desire to have his wife take under the antenuptial agreement and under his will, rather than elect against the will. He frequently told her in later years that the antenuptial agreement did not mean a thing, which it probably did not: Flannery's Estate, 315 Pa. 576; McClellan Estate, 365 Pa. 401. Apparently, with this in mind, settlor conceived the plan of placing the Ashmont apartment house with its 50 apartments in trust, with the idea that the net profits be accumulated and added to the trust res until his death. He appointed himself a trustee; another trustee was his son, in whom he had the fullest confidence; and a third trustee was his friend and main business associate. It was a close personal arrangement. From the testimony it appears that a Mrs. Alma Johnson, a salaried employe, operated the Ashmont Apartments. A certified public accountant in Los Angeles audited the monthly accounts. He, the C.P.A., received the monthly receipts of the apartments and the rental records and remitted the net income of the apartments

to Mr. Case in Allentown, who in turn deposited them in the trust account of the Merchants National Bank of Allentown. Mr. Case, accountant for the Hotel Traylor, Allentown, Pa., kept the trust records for the trustees. All these parties, for this service, were paid out of receipts of the Ashmont Apartments.

The testimony indicates that the active management of the apartments was in the hands of the paid employes. Samuel W. Traylor, Sr., was the only trustee who appeared interested in the operation of the Ashmont Apartments from the inception of the trust till his death in 1947. There is one exception to this statement, and that was while Mr. Traylor, Sr., and his wife were in Florida, a message came to him that a hurricane had damaged the roof of the Ashmont Apartments. He referred the matter to his son, Samuel, Jr., for attention. Settlor and his wife each year visited Los Angeles for a period of three months and during their last two visits stayed at the Ashmont Apartments.

Under these circumstances it is understandable why no commissions were charged during the lifetime of settlor. The whole thing was his project. It was his money that created the trust. He associated with himself, his son, and close business associate. So far as the record shows, during the lifetime of settlor, their services to this trust were insignificant. If the trustees are to be compensated for service rendered and responsibility assumed during the lifetime of settlor, then the only trustee entitled to compensation was settlor himself. It follows if no service has been performed by a trustee, he is not entitled to any compensation whatever. "The mere fact that he is a trustee will not support a demand on his part for compensation": Harrison's Estate, supra, 209, 210.

We have no difficulty whatsoever in finding from the evidence that settlor did not intend to charge for his services. It is incredulous to suppose that settlor with

one hand would zealously and thoughtfully build up a fund for the security of his wife, and with the other hand diminish the fund by taking money therefrom as commissions. Settlor never took a dollar from the fund for his own use, nor did he divert any net income to any other fund during his lifetime. It is clear that settlor waived his right to commissions. He was the only trustee who earned compensation during this period.

In Taylor's Estate, supra, 153, 167, is stated this principle of law:

"A personal representative may waive or renounce his right to compensation, and such waiver or renunciation need not be expressed but may be implied from his acts and conduct."

And, of course, what amounts to a waiver must be determined, like all questions of waiver, by the acts or omissions of the party otherwise entitled to claim them: Wiener's Estate, 4 Dist. R. 422; Taylor's Estate, supra, 167.

Likewise, we find that the other trustees by their acquiescence in the acts of settlor, have waived their right to commissions during the lifetime of settlor: Scull's Estate, supra, 57, 61. Moreover, the statute of limitations would operate as a bar to commissions on income paid more than six years before the accounting: Horwitz's Estate, 7 Dist. R. 179; Hess Estate, 11 Dist. R. 397; Arata's Estate, 7 D. & C. 135.

However, in addition, we find as a fact that the services of the trustees other than those rendered by settlor himself, were almost nil. They are therefore entitled to no commission for this period.

"Commissions are given as a compensation for labor and responsibility, and where neither the one has been performed, nor the other incurred, there is nothing to be compensated": McCauseland's Appeal, 38 Pa. 466, 470; Fiscus' Estate, 13 Pa. Superior Ct. 615, 620.

For the reasons given, we sustain exception 1 insofar as it relates to services rendered by the trustees during the lifetime of settlor. As to the question of denying the present trustees all commissions, the exception is dismissed for reasons that will follow.

Exceptant urges upon us that the trustees not only waived their right to commissions for the period covering settlor's lifetime, but by their actions after the death of settlor waived their right to commissions. In support of this theory, exceptant points to exhibit F attached to the record papers, wherein the trustees in accepting the election of the widow, Lottie G. Traylor, to abide by the provisions of the Ashmont Trust, made the following declaration:

". . . do hereby declare that the Ashmont property described in said Indenture is free and clear of all encumbrances at the present time, with the exception of its liability for the payment of any estate, inheritance or succession taxes and current real estate taxes, water or sewer rents. . . ."

Exceptant argues that if the trustees had contemplated the presentation of a claim for commissions upon the filing of the first and final account, they would have stated in the declaration that they had such intentions.

We do not regard the silence of the trustees in this written declaration as barring them from compensation. By analogy, the principle of law to which we have hereinbefore referred and found in Kennedy Trust, supra, 310, is applicable here. There it was held, citing earlier cases, that notwithstanding that the trust deed was silent as to the compensation payable to the trustees, nevertheless upon the termination of their fiduciary duties and faithful handling of and accounting for the trust corpus, they were entitled to just compensation.

Of course, if the accountants had stated that they intended to claim compensation, there could be no question of waiver of commissions. However, the situation with respect to the trustees' acts after the death of settlor is quite different from what it was during his lifetime. After the death of settlor, the trustees became active. Thus, they conferred with Mrs. John son, the manager of the apartments, concerning rents and the renewal of restrictions by the Office of Price Administration, and after exceptant moved into the Ashmont Apartments on May 20, 1948, the trustees continued to manage and operate the apartment house in coöperation with her, and have, since the termination of Mrs. Johnson's employment as manager, signed all checks pertaining to its operation. The trustees purchased new carpets in the amount of $13,000, had furniture reupholstered, and purchased new linens. They had some disagreements with exceptant regarding the purchase of 49 gas ranges for the apartments and the redecorating of the apartments. It appears that the trustees conferred with exceptant concerning the selling of the Ashmont Apartments and that on or about December 15, 1948, they informed exceptant that a California real estate man said he had a purchaser for the Ashmont Apartments for the sum of $225,000.

In addition to these services, the trustees have filed the account now before us, and later, in pursuance to this adjudication, will be required to transfer title to the property of the trust estate to Lottie G. Traylor. This, of course, will entail conferences, time, and trouble, and in our judgment they should be fairly compensated for the services performed and the responsibility assumed. Accordingly, they will be allowed compensation for the services performed since the death of settlor.

In exception 2 exceptant urges that if the court finds that the trustees are entitled to compensation, the amount of $23,083.45 is unreasonable and all out of proportion to the value of their services. We, too, regard this amount as grossly excessive for reasons already set forth and to follow.

The account shows that the gross income received from 1939 to the end of 1950 amounted to $326,669. The trustees have taken credit for five percent of this amount, or $16,333.45. In addition, the trustees have charged three percent on the real estate carried at $225,000, or $6,750.

If the compensation were calculated on a percentage basis, we apprehend that $225,000 is not the correct figure on which to base the commission. When this trust was created in 1939, the value of the trust res was set up at $110,000 on the books of original entry by testator. Presumably, this was the fair market value at that time, and it was not until December 31, 1941, that a change was made on the books of the trust, reducing the valuation to $85,000. This was done after consultation with the Internal Revenue Department concerning the gift tax, etc.; the $225,000 value is based on an offer made for the premises after the death of settlor.

It is well settled that commissions are allowed on the appraised value of the corpus at the time it reaches the hands of the executor or administrator.

"Subsequent accretions should not increase the allowance of compensation, nor losses reduce it, unless exceptional circumstances in fairness require that this be done": Gardner's Estate, 323 Pa. 229, 239; Miller's Estate, 132 Pa. Superior Ct. 437; Smith's Estate, 35 D. & C. 383, 385. There are no exceptional circumstances which take this case out of the ordinary rule. The enhancement in value of the apartment property

was due largely to changed economic conditions between 1939 and 1948.

We have concluded that the trustees are entitled to no compensation for services rendered during the lifetime of settlor. On the other hand, we believe that the trustees are entitled to compensation for the services rendered in this estate since the death of settlor and which services we have hereinbefore detailed. In view of the peculiar situation here existing, we will fix compensation in a lump sum rather than on a commission or percentage basis: Twaddell's Estate, 81 Pa. 221; Perkins Appeal, 108 Pa. 314; Harrison's Estate, supra, 207; Davidson Trust, 354 Pa. 333, 337; Brooks' Estate, 249 Pa. 66, 69. After all, compensation and not commissions is the true and proper standard: Williamson Estate, supra, 343, 349, 356, 357, and cases cited.

In our judgment a fair and reasonable compensation for all services rendered to date and to be rendered by the three present trustees because of this adjudication is $5,000, and this sum we allow them. Accordingly, exception 2 is sustained and the credit claimed in the amount of $23,083.45 is disallowed and stricken from the account, and a credit of $5,000 is substituted. The effect of this action will be to increase the cash balance for distribution from $2,845.14 to $20,928.59.

Exceptant in her third exception requests that the accountants be surcharged with interest at the legal rate on certain sums of money paid to Dr. Warren Traylor from the respective dates when such payments were made to the date of repayment thereof. Exceptant argues that this cash should have been invested in income producing investments, and that since this was not done, the trustees should be surcharged with interest on the same. Exceptant complains that a total sum of $6,073.72 was a loan to Dr. Traylor. The

trust books reveal that this sum was paid to Dr. Traylor as salary for services to the trust estate from 1941 to 1944 at the rate of $150 per month. Dr. Traylor, the son of settlor, in addition had occupied one of the apartments in the Ashmont building. We need not tarry to decide whether this represented a loan or was payment for services rendered. It appears that after exceptant complained to the trustees that this sum should not have been deducted from the fund, they replaced the sum without more ado.

We observe that the deed of trust gave the trustees no authority to invest or reinvest any of the net income. The trust agreement provided that the net income should be accumulated and become part of the principal of the estate. It was the intention of settlor to accumulate a sum of money, which for reasons of his own, he as the active trustee did not invest. This he had a right to do since it was he who set up the trust. Apparently, it was his intention to reserve a large sum of cash to meet sudden contingencies such as estate taxes, etc. Whatever his reason for not investing, it seems to us unreasonable and unfair to surcharge the trustees with interest on this money which Dr. Traylor received, especially so since settlor himself did not invest any part of the net income. It should be remembered that when this money was paid to his son, Dr. Traylor, it was paid at a time when settlor himself was the active functioning trustee. Whether it was a loan or money earned for services rendered in connection with the apartment building, becomes immaterial in view of the fact that the present trustees were instrumental in having it returned, this without any caviling. Exceptant is not hurt because of this transaction.

Finally, it must be borne in mind that exceptant was but a conditional beneficiary who could accept the benefits of the trust or reject them after the death of set-

tlor. This is quite different from the compensation question where the compensation was charged after exceptant accepted the terms of the trust agreement, the will, and the antenuptial agreement. Exception 3 is dismissed.